The next case on the docket is Sloan v. American Agencies, 17-4202. Good morning, I think still possibly. May it please the court, Richard Salgado of Denton's representing Brent Sloan in this appeal. And your honors, there's a couple of different issues in this case. Please pull that microphone a little closer to you. There's a couple of different issues in this case. And I'm going to start with improper means, which is a jury instruction issue. And in this, improper means under Utah law is a required element of interference with contract. This has been made very clear in recent years. The Utah Supreme Court held this in Eldridge. And then as well, this court reached that in SCO Group v. IBM earlier this year, applying that whether it's interference with prospective business relations or interference with an existing contract, the test is the same and does include improper means. Let me ask you, and this is probably applicable to both sides. As I understand it, everybody agrees that the Utah Supreme Court has already taken accepted certification of a question that's been pending, I think, since June 2017, and that everybody in the case apparently expects the Utah Supreme Court to decide. And if it's been pending for over a year, presumably it'll be any day. Why shouldn't we just wait on that? Well, your honor, that is certainly something that the court can do. Candidly, there's different schools of thought on that. I would submit that right now I believe the 10th Circuit has the law in front of it and the precedent in front of it to go ahead and rule without waiting. I think that the reason it's in the Utah Supreme Court, interestingly, is because of this case. What happened here was Mr. Erickson, who also represents the parties in the Utah Supreme Court case, appeared before Judge Benson, and Judge Benson was faced with the decision in Garthrow Green by Judge Neufer. And then he looked also at this case, Judge Kimball's decision in ARS, and said, well, all right, we have two differing opinions here. Hey, Utah Supreme Court, help me out on this. Since then, however, additional voices have been added. There's a couple of decisions by Judge Parrish, who herself was on the Utah Supreme Court, of course, when they decided Eldridge. And those also recognize that the improper means requirement is a required element of the test. And, again, I would submit as well that SCO, which this court decided earlier this year, also recognizes as much. But SCO was, you know, you may be able to point to some of Judge Bell's language, perhaps, but the panel was solely addressing a tortious interference with business relations claim. That's the position, certainly, that AA has taken in the appeal here. Well, that's true. That's not how I read it. When I look at it, I see both interference with prospective relations, and I see interference as well, and we've briefed that with contract. Now, Mr. Erickson filed, I believe, a day or two ago, a 28-J letter, really more of a thorough reply, essentially arguing that it was an at-will contract, not a fixed contract, not a fixed-term contract. And that, again, so even their position is there was contracts at play there. They differ over whether it was at-will or a fixed contract. But I would submit that there absolutely were contracts at play as well as prospective relations. And so based on that, I would say the law is here for this court to rule the improper means are required. Now, certainly it's in the court's discretion to say let's put this on the shelf and wait a few months and see what happens. I just don't know how long the Utah Supreme Court will take to decide it. Well, but you're asking us to divine what they're going to do, and I'm one of the few judges that I remember years ago that we did go ahead and proceed with an opinion and said that this is what the Supreme Court of that state was going to do. And lo and behold, three years later, they did just the opposite. So do both counsel agree that this instruction would be dispositive of this case? I certainly believe it is. I think that that's a question. I'm like where Judge Bacharach. That's a question for both counsel in that, because if that's going to be dispositive, it just seems to me like that we're wasting time, your time, when that becomes the main issue. And depending on which way they come out, one of you is a winner and the other one is a loser. So why do we go in and waste our judicial economy on speculating? And that's where we start with. We're speculating as to what the Utah Supreme Court is going to do. That's my thought. And I can't disagree with that. I think if I was in your shoes, I very well, I mean, when I clerked, I probably would tell my judge, just wait on this. I think that that's a very logical decision here. I do see a position where the existing precedent is there to simply apply SEO and proceed as a matter of efficiency. But I also see the other side. I think that I do think AA has taken the position here that even if improper means is required, they would say improper means were nevertheless found on a different claim here. And so, therefore, you should still affirm even if improper means was required. That's incorrect. The law is very clear on jury instruction that it's even possible. Well, you're here. Both counsels here. And I don't want to take up any more of your time on your issue as to what you want to argue because you're the appellant. You lost below. So I guess have at it. Absolutely. Well, Your Honor, I'm simply, I'm not addressing what the standard should be. I'm just saying that if the standard, if the Utah Supreme Court comes down in a month and says, okay, improper means is required, I think AA's position at that point would be, well, we still met it, they would say, because improper means was found on the prospective business relations claim. And I just wanted to explain briefly why that's not so. Well, the standard is really clear that if there's any possibility that the jury instruction would have made a difference, it has to be reversed. That is very, very well established here. And here I would actually point out that there was different conduct at play. Turning actually to the decision of the district court here, they pointed in the ruling of the Jaymal the following evidence supported that Mr. Sloan and these defendants induced the breach of the contract, and that was the offering of shares, positions, monthly base salaries to the people at ARS. None of that would be improper means. And so I think there's absolutely a possibility here at least that it would require reversal. And I would actually say more so there's no basis to even sustain at all and simply render on that that there was no sufficient evidence even that improper means existed as to the interference with the contract by Mr. Sloan. Now, on that, I think that certainly Mr. Erickson may have more to say, but I am going to move on to the other issues briefly here. One such issue is the consequential damages that were awarded, the attorney's fees that were awarded. That's a very sizable amount of $1.5 million in attorney's fees that were awarded. And if the court reverses based on improper means instruction, those also drop off. However, I would also urge the court to reach that issue at this time as a matter of efficiency, simply because they have a very unique theory here of the third-party tort exception, third-party litigation exception to award attorney's fees. Simply put, they've essentially said we have four joint tort fees here. They all did something together. We sued all of them, and now we want attorney's fees, you know, person A, B, C, and D. We're going to seek attorney's fees from A as to litigation against B, C, and D. Mr. Salgado, can I ask you, and I'm sorry to interrupt you, but on preservation of that issue? Yes. And let me just tell you how I'm understanding it and my concern about preservation, and then if you can set me straight. The district court, as I understand it, specifically instructed the jury that you are to determine, if you find liability, that one of the species of the remedy that you can award is attorney fees that was incurred in this other litigation. And that if you determine that, then he was going to determine, he didn't say all this, but then he was going to determine after the fact, much like any other application for an attorney fee, of the amount. And so the jury that was in the box is instructed. There was a jury instruction conference. The judge asked for objections, no objection to the instruction. There were objections to the instruction, but not on this. And so then the jury makes its finding. Then the judge later sets the amount, and then you elaborate on the objections that you had made at the jury instruction conference and make this specific argument that this is not third-party litigation, it's the same parties, it's the same co-defendants with joint fees or liability, but that had not been a ground for an objection to the jury instruction. And it seems to me that I'm concerned that you needed to object to the jury instruction on this ground. Why is that incorrect? Well, Your Honor, this was a moving target here. It really was. A month or so before trial, A.A. disclosed their damages model, their damages claims to us, and they listed the breach of contract claim as being the source of the third-party litigation exception, consequential damages, attorney's fees. So we made our jury instruction objections based off of that. We were targeting, hey, wait, you can't base off breach of contract here. There's a provision in that contract saying that absolutely not, there's no attorney's fees here. So we aimed everything at that. They then moved the target. They dropped it from being breach of contract, and they instead refocused it over onto interference claim. Before or during the trial? It was before trial, after we'd filed. So when the jury instruction conference or the judge asked for instruction, objections to the instructions, at that point you knew precisely what A.A. then was predicating their ground for attorney fees as consequential damages, right? Candidly, at the moment, it was not super clear to me. I think looking back on it now and as I sort of unpackage it, I can decipher where I think they were going now in retrospect. At that time, I was still facing, here we have this claim for attorney's fees. We have a contract saying there's no attorney's fees. So we were focused on that, absolutely. Our position was absolutely no attorney's fees were proper before the court. The only question, as a matter of jury instructions, though, the only question put to the jury, and this is important for purposes of the instruction issue, was foreseeability. The existence of the right to attorney's fees was a completely different legal issue, and that was something we fully briefed in the post-trial briefing with the court as to whether attorney's fees as a matter of law. We couldn't move. Had we gotten that? Had they actually disclosed that properly six months or a year before trial? There would have been a summary judgment on that. Wait a minute, counsel. That may be some kind of answer to Judge Bacharach, but I didn't follow it because when you had the settlement of the jury instructions, the instruction is there as to what they're asking for, what the jury is being told to do. Yes. Excuse me. And you didn't object. I objected. What you're trying to do is give us an explanation, but not one to Judge Bacharach's question. Your Honor, we objected that there shouldn't be an instruction on the jury instruction at all. To be specifically object to this particular basis or aspect of it, at that moment we did not, but also at that point the question to the jury was one of foreseeability. And so the legal issue is an issue we never had an opportunity even to brief properly before the trial. This is something we would have moved for summary judgment on if we'd had that before us. Did you make that argument? Let me follow up on Judge Bacharach's question. So if you're saying that an explanation for your lack of this specific objection, that the jury didn't actually answer the question that the judge is relying on to set the amount, did you then make that argument in your Rule 50B motion to the district court that you're making to us now? In other words, Judge, you're setting the amount on something that the jury actually never found because you didn't ask them the question that you thought you asked them. If I understand your question, Your Honor, and I want to save a little bit of time. Can I ask you, in a better way, I think, because it was such a convoluted question, did you ever make the argument to the district court in any fashion that you're making to us now? Oh, absolutely. Absolutely we did. Post-trial, there was a whole cycle of briefing on the consequential damages issue. There was both. Now, the judge ultimately answered in one ruling, in one order. But there was, he consolidated into one order. It was two separate sets of briefing. There was 50A, 50B briefing. But then there was a separate briefing on punitive damages, consequential damages. And that was where, as a matter of law, we said, wait a second. Now that we understand what these guys were aiming at, this is a bait and switch on us. This is absolutely improper as a matter of law. I have one minute left. So if it's all right with the Honor, I'm going to go ahead and reserve that remaining minute and try to make as much of it as I can. Thank you. May it please the Court. Mike Larrickson on behalf of Appellee American Agencies. I'd like to jump right to the heart of the questions that you began with, Mr. Salgado, and that is the question that's now before the Utah Supreme Court. And just for clarification, Judge Bacharach, oral argument was held in October, and so now the decision is pending from oral argument. The reason why this Court can decide the jury verdict now is because of the issue that Mr. Salgado raised, and that is that even if there were an issue with the jury instruction, the jury already found improper means in relationship to the interference with business relations claim. In fact, there's some irony to the appellant's position in saying that these claims are the same and that they both require improper means, and interference with contract and interference with business relations is essentially just interference in general, and then saying that the jury's decision of finding improper means with the interference with business relations claim now doesn't apply to these claims that are, from the appellant's point of view, so closely tied together. But there was one theory on the improper interference with business relations, the interference with the retail, the RILP, I think, the license agreements, that was not applicable to the breach of contract claim, the tortious interference with contract claim, right? Yes. So the theories of improper means actually were different. And that's an excellent point, Judge Bacharach, and I think that both of us agree, this is in the briefing, both of us agree that those RILA agreements as being improper means were applicable only to Mr. Reynolds and Mr. Mitchell. And the jury decided individually for Mr. Sloan, Mr. Mitchell, and Mr. Reynolds, that there was an interference with business relations which requires them to find for each one of them an improper means. And we agree that there are two ways in which the jury could have found improper means for interference with business relations, and it was either unfounded litigation or deceit or both. But wasn't there also a cause of action for conspiracy to tortiously interfere with business relations? There was, and there was a finding by the jury of a conspiracy on both. That's an issue that's not raised in the briefs, Your Honor. I believe that the underlying act for the conspiracy would be the interference, and they would be tortiously interfering with one another. But I think that the way that would have been, the way that would have worked out if the jury had under that theory, I think the jury would have said, no, Mr. Sloan was not involved in an interference with business relations because he did not himself interfere with the RILAs or use the threats about the RILAs, and that that wasn't a ground for improper means. And then they would have found him nonetheless liable for part of the conspiracy. So I think the only way that the jury checks the box on Mr. Sloan having the elements of the interference with business relations tort is for the jury to have found either unfounded litigation or deceit. And we've agreed on that in the briefs. And I think the clearest way to see the relationship between the interference with contract claim and the interference with business relationship claim is to focus on the similarities between the claims. Mr. Salgado would like to focus on the differences. And he's highlighted that while there were salaries or there were shares offered, but there are some obvious differences between a stallion and a mare, but they're both horses. And that's what we really need to focus on here. And here's what the parties did not dispute. The purpose of the lawsuit of the unfounded litigation that the jury found, that it was to obtain a divorce from the contractual relationship between American agencies and ARS. These are Mr. Sloan's exact words found on Appellant's Appendix 1622. Quote, I funded it, the lawsuit he's referring to, in response to just to try to have a judicial determination that the relationship was at an end so the parties could move forward. Now, the parties disagreed about the justification of these motives. At trial, Mr. Sloan and the other defendants said, well, this was our state of mind, was that we'd gotten advice of counsel. That's found on Appellant's Appendix 1206. There was this dispute of whether or not it was an attack or whether or not it was advice of counsel that was the motivation for them to have filed the lawsuit. But what was agreed upon was that the purpose of it, for Mr. Sloan's own words, the purpose of it was to end the relationship, to end the contractual relationship between American agencies and ARS. And so it was a fundamental predicate that was similar to both the business relations and the interference with contract claim. It had separate injuries. The interference with the contract interrupted American agencies' ability to, well, to have the right of first refusal to have obtained ARS. And then, as another fallout from that, it interrupted the business relationships that American agencies had with its customers. Because of the loss of the right of first refusal and the need to transition to a new software, there was interruption to customer relationships that triggered a different injury. But at the heart of both of those claims was the reality that the purpose of the lawsuit was to interrupt. So this unfounded litigation that the jury found was to interrupt and to end the relationship between American agencies and ARS. Similarly with deceit. What was the deceit about? The deceit was about the sale of ARS, the circumvention of the right of first refusal. And so if the jury found that deceit was employed to interfere with the business relationships, it was a derivative of finding that deceit had been used in the sale of ARS. The jury could not have found otherwise. These issues were inextricably linked. And that's the language that is identified in the Gifford and Vail Resorts case. In that case, you had a common law negligence claim and you had a statutory claim under a Ski Protection Act. And the issue in both cases was that the jury, pardon me, that there had been a finding of an inherent danger. The jury had found an inherent danger that had negated the negligence claim. And then even though they hadn't reached the statutory issue because they'd been instructed not to, there was no error because the statute had defined that if someone, the allegation was that there had not been a sign to go into out-of-boundary ski area. And so if they had not, but they didn't need to put up the sign for the ski area because there was an inherent danger. So at the heart of both the common law claim and the statutory claim was an issue, the same finding by the jury that there had been an inherent danger and risk to skiing. And therefore, even though the jury didn't reach the issue in the statutory claim, this court found that it was not a reversible error because the jury would have had to have found the same, made the same finding. The issues were inextricably linked. The same is true here with the interference, with contract interference, with business relations claims. I'd like to focus on the preservation issues for the remaining claims because they can be easily and simply decided on that grounds. I'd like to pick up where you, where this, Your Honors, where you left off with Mr. Salgado on the third-party litigation exception. And I think that what's helpful here is to rehearse a brief timeline. The first argument to the jury instructions on the third-party litigation exception was that the parties' contract, and this is the parties between American agencies and ARS, that there was a no consequential damages provision. And so the first argument was that, and this is the language that is quoted in the brief in the reply brief, is this was a legal impossibility. But the argument of why it was a legal impossibility was the suggestion that a no consequential damages provision barred American agencies from recovering against Mr. Sloan. But, of course, there was no privity between American agencies and Mr. Sloan, and so a consequential damages provision between American agencies and ARS didn't apply towards seeking fees or consequential damages against Mr. Sloan. So that theory was abandoned. Then at the jury conference, that was repeated, and you can see this by simply reading the citations that Mr. Salgado provides in the reply brief. At the jury conference, a few additional arguments were provided. One dealt with negligence, a suggestion that in the case law that the third-party litigation would apply to torts, has only been negligent torts. We made very clear that it was applicable to a lower standard of culpability and negligence. It clearly would be applicable to a higher standard of culpability for an intentional tort. Secondly, there was some suggestion that while they were trying to double-dip, they were getting contract damages, and a suggestion that somehow this was a tort-like damage. We explained that consequential damages, of course, are contract-like damages. Those were the theories that were before the court, before it was submitted to the jury. After the verdict, the first, the next variation of the argument was separate litigation. Now, this is important. It was not the joint tort fees or argument that's being made now. It was simply separate litigation. It didn't appear in the Rule 50A motion or in the Rule 50B motion, but it did appear in the response to the motion for attorney fees. And the only argument was this. It was a simple argument that said third-party litigation means a third party. They can't be involved in the same lawsuit. And we made the argument to the district court, Judge Kimball agreed with, that that doesn't make sense. That would encourage multiplicity of lawsuits by suggesting that simply because the, for instance, if you have an interference with contract that causes you to have a litigation with the breach of contract, you'd have to bring them in separate claims, separate lawsuits, in order to be able to get your fees from the tort side of having to pursue somebody else for breach of contract. Judge Kimball said that, agreed, and said that doesn't really make sense. Now, for the first time on appeal, the phrase joint tort fees appears. If you search for that in the Rule 50A motion, the Rule 50B motion, even the response to the motion for attorney fees, you won't find the phrase joint tort feesers. Now, admittedly, that argument does have some merit to it when it's very discreetly applied. And when you look at the joint tort feeser of just the particular tort of interference with the contract. But the cases that have held that have looked at it from a tort where the joint tort feesers were essentially involved in the same tort, but there wasn't fallout litigation. And that's not the case here. Because here you had tort feesers that were inducing the breach of the contract, and then you had a separate party ARS that was then involved in litigation with us. Then you had another party, SAGEX, that was involved with litigation over those torts. And the district court said that there were differences between the claims. And so you have a situation where you have some claims that are dependent on the other actions, and then you have some claims that do. We would agree, for instance, that had this issue been raised at the district court, had it been raised down below, we would have agreed at looking at the case law and said, well, specifically, you could try to carve out the interference, the fees that were just involved with the interference with contract and say that among those joint tort feesers, those fees couldn't be recovered. But we still ought to recover fees for the breach of contract that was caused with ARS. We still ought to be able to recover the fees that was required with the litigation with SAGEX. And had that happened at the district court, there could have been some allocation of fees made. But it didn't. And it simply can't be raised now on appeal. And even more so, Mr. Sloan doesn't ask for this court to make a thin, narrow ruling in just carving out some of these fees that would be applicable to this new joint tort-feeser argument, but he asks for reversal on everything. And that certainly can't be the case. And so with that background, it seems very clear that the third-party litigation arguments that are being made are raised for the first time on appeal and were not properly preserved. Now, just briefly on some of the other arguments that were not preserved, for instance, there are some arguments on the interference with business relations claim on the improper means of unfounded litigation and deceit that suggests that there wasn't insufficient evidence, really. These are legal objections. The only argument made in the Rule 50A motion was, and I quote, AA has presented no evidence that any defendant intentionally interfered with any potential economic relations by any improper means or that any such claimed interference caused any injury to AA. There was never any attempt here to identify whether or not it was a criticism of the intentionality element, whether it was the economic relations element, the improper means element, or causation. It was simply a blanket denial of all the elements. If we hypothetically conclude that it was preserved, how could a jury reasonably make any determination of whether the litigation was unfounded? The district court says, okay, understandably, I'm not going to tell you about the fact that I denied the motion to dismiss. I'm not going to tell you what the defenses were. I'm not going to tell you anything. The plaintiff lost. So you determine whether or not the litigation had been unfounded. I mean, how does a jury make that determination? Your Honor, an excellent question. There are two ways that the jury or two key facts that the jury was aware of. As you point out, they were aware that the litigation was unsuccessful. So they knew that the litigation was unsuccessful litigation. Here's the other key fact that they knew. And admittedly, this isn't fleshed out as much in the briefs as it probably should be. But you can find it in appendix, an example of it, in 1206. And that was that there was an argument before both sides over the purpose and the motivations of the lawsuit. And the appellant, Mr. Sloan, specifically wanted to introduce evidence of this because they wanted to try to attack the punitive damages, the willfulness. And so there was a lot of evidence that was submitted on state of mind. Over and over again, the defendants argued that they were doing it on advice of counsel. And so their motivations, the purpose of the lawsuit was on advice of counsel. Now, on the other hand, the jury heard plenty of evidence that Mr. Sloan had been wanting to get into the debt collection business. And that what stood in his way was a contract between American agencies and ARS. And the jury, apparently, based on its findings of improper means in the business relations claim, as well as its findings of punitive damages or the willfulness elements of both, found that there was an intent there in interfering with the contract in order to obtain that for himself. Now, this is very important. It's brought up in the reply brief that we haven't had an opportunity to respond to. Mr. Salgado, in the reply brief, suggests that what I've just pieced together, this improper purpose combined with unsuccessful litigation, is not properly an improper means under the Utah Supreme Court's holding in Eldridge. But if you look at the very end of that decision, the very end of Eldridge, there's a discussion about how motivation is still relevant, now that the Utah Supreme Court has done away with improper purpose. And what they said is, look, we've done away with improper purpose by itself. If your tort is just for a business relations claim, if your tort is just that you competed and you wanted their customers and you had an ill motive in wanting to get their customers, that's not enough. There has to be action to it. There has to be means to it. And the example that they specifically called out was abuse of process. And they said, under Utah law, there's a claim for abuse of process. And what you have to prove in abuse of process is the use of legal means. It doesn't even have to be successful. The use of legal means for essentially an illegitimate purpose. And they said that combined, you have a means, you have the use of the legal means combined with the improper purpose that is an improper means. Yeah. I'm not meaning to cut you off, but I think you adequately answered my question. Thank you very much. Thank you very much. I'll just pick up very quickly first on unfounded litigation on that. Judge Becker, that's absolutely correct. They fought in this case to prevent any evidence about what the claims have been, what the defenses have been, and there is absolutely no basis here for there to be a finding of unfounded litigation. I do want to briefly talk about preservation, and specifically preservation as to the interference with perspective relations. In the 50A that Mr. Erickson just read, we were at that point in the trial, before the closing arguments, and I had been sitting there looking essentially at the list of, well, here's the improper means. We saw none of that. We correctly moved saying there was no evidence here, improper means, and improper perspective relations. After we had the closing argument given, I saw Mr. Rice do his best to say, well, here's the improper means for interference with relations. I didn't know that going in. I didn't know what it was. There was no 50A after that. In the 50B motion, what we could have done very easily is say the same thing we said in 50A, let them come and bring those same arguments and then knock them down one by one for why those don't count. We shadowboxed a little bit. We jumped out in front and said, this is what we heard them say after our 50A. None of those would have counted. Unfortunately, because we did it afterwards, they've turned it into a waiver argument, but it's not waiver. It's simply saying what we said in our 50A, which is none of those are improper means. And if there's no other questions from the Court, I will rest with that. Thank you very much. Well presented by both sides. This matter will be submitted. Thank you, Counsel.